SUPREME COURT. New-York Special Term, June, 1856. *S. B. Strong*, Justice.

## THE PEOPLE *v.* LEWIS BAKER and others.

A certiorari, to remove an indictment from the Oyer and Terminer to the Supreme Court, before trial, may be issued on the application of the prosecution.

And where a cause so removed is pending in the Supreme Court, and it appears that a fair, impartial and effectual trial cannot be had in the county in which the indictment was found, the Supreme Court, at special term, will order the trial to be had in some other county.

Where the indictment is against several persons, and enough is shown on the part of the prosecution to make a change of the place of trial proper as to one defendant, the change will be made as to all the defendants, although it is a case in which every defendant is entitled to a separate trial.

And where it appears, in opposition to such application, that the defendants' witnesses are poor and unable to bear the expenses of a journey to another county, and that the defendants also are destitute of property, the court may require, as a condition to changing the place of trial, that the district attorney procure some arrangement to be made by which the county, in which the indictment was found, shall pay the necessary expenses of the indigent witnesses subpœnaed in behalf of the defendants and attending at any court in which the trial shall not be postponed at their instance.

Ordinarily, where the place of trial is changed in a criminal case, an adjoining county should be selected; but if the necessity which requires the change calls for it, a more remote county may be designated.

THE defendants were indicted, in the New-York Oyer and Terminer, for the murder of William Poole. After a trial in which the jury did not agree, the cause was removed by *certiorari* into the Supreme Court. A motion was now made, in behalf of the prosecution, to change the place of trial from New-York to Suffolk or some other county, on the ground that a fair and impartial trial could not be had in the city and county of New-York. The counsel for the defendants moved to quash the *certiorari*, on the ground that it could not legally be sued out by the prosecution. By consent, both motions were heard together. The motion to change the place of trial was founded on the following papers:

*City and County of New-York, ss:*

*Stephen B. Cushing*, being duly sworn, deposes and says: That as Attorney General of this state he attended upon the trial of Lewis Baker, indicted for murder, in the Court of Oyer and Terminer, in the city of New-York, for the term of April, 1856. That the indictment was called on for trial by the people on the second Monday of April, and the proceedings in respect to a trial commenced by calling and challenging and swearing jurors. That the first panel of five hundred jurors (after excuses to the commissioner of jurors and to the court were given, and after absentees had been fined) had remaining upon it about one hundred jurors who answered; that of this number five jurors in chief were obtained; two were challenged peremptorily by the prisoner's counsel, and one was set aside by triers upon a challenge to the favor by the people. That a new panel of five hundred jurors was then ordered and served after some days delay; of the jurors named upon which two hundred or thereabouts answered, and seven jurors in chief were obtained who were impartial, one of whom was excused by the court because of religious objections to sitting as a juror upon Saturday, his Sabbath. That this additional number of jurors was exhausted, and one more juror became necessary; whereupon an additional number of two hundred and fifty jurors were summoned, about seventy-five of whom were first examined before the twelfth juror was obtained as being impartial. That of all the challenges only three were peremptory; the great majority of them being for principal cause, and being found true by the court. That this deponent doubted the legal propriety and expediency also of exhausting one panel of jurors, in a capital case, and then adjourning the trial to obtain other jurors; but yielded his doubts to the extreme anxiety of the prisoner's counsel to obtain a jury in the county of New-York.

From the experiences of this attempt to obtain a jury in the city of New-York, in regard to the difficulties in procuring individuals unbiassed and not impressed by newspaper reports, to act as jurors, and in regard to the delays and irregularities necessarily attending prolonged examinations and challenges of jurors, deponent is constrained to the opinion that whilst the obtaining of an impartial jury in the city of New-York, upon another trial of the indictment against Lewis Baker may be possible, it is improbable, and certainly attended with delays and irregularities which would be prejudicial to the interests of the people prosecuting the said indictment.

Deponent joins in the motion of the district attorney to change the venue of the said trial.

STEPHEN B. CUSHING.

Sworn before me, this 1st )
   day of May, 1856.    }
      HENRY VANDERVOORT,  *Clerk of Sessions, &c.*

*City and County of New-York, ss:*

*A. Oakey Hall,* being duly sworn, deposes and says: That he was present in behalf of the prosecution, spoken of in the foregoing affidavit of Mr. Cushing, during the whole of the proceedings, in respect to the trial above alluded to; that he kept a tally of jurors answering, and of the respective challenges, and from his said tally he finds the result in terms as set forth in the foregoing affidavit.

Deponent further says: That the trial first had upon the indictment against Lewis Baker occupied more than a week, and that the evidence and speeches of counsel were stenographically reported for and published in all the city newspapers, and to deponent's belief were very extensively read in this city; that the merits and demerits of the said trial were very extensively discussed in public and in private, and the editorial comments in the newspapers, both for and

against the prisoner, were frequent and pointed in their expressions.

That, in the opinion of this deponent, a jury which is at once impartial and intelligent cannot be obtained in the county of New-York.

                                        A. OAKEY HALL.

Sworn this 5th day of May,
  1856, before me.

    HENRY VANDERVOORT, *Clerk of Sessions, &c.*

*City and County of New-York:*

I, Henry Vandervoort, Clerk of the Court of Oyer and Terminer in and for the city and county of New-York, at the request of the district attorney, do certify: That at the April term, 1856, of the Court of Oyer and Terminer, twelve hundred and fifty jurors were summoned for the purpose of trying an indictment against Lewis Baker for the murder of William Poole; about four hundred appeared; two hundred and twenty-two were set aside on challenge, having formed or expressed an opinion as to the guilt or innocence of the prisoner; three were peremptorily challenged by the prisoner, after passing the ordeal of principal challenge and challenge for favor; twelve jurors were sworn in chief; the remaining jurors were discharged, or excused by the court for various reasons, or were not drawn, there remaining in the ballot-box, on the completion of the jury, about twenty ballots.

Given under my hand, and attested by the Seal of the said Court, this seventh day of May, in the year [L. S.] one thousand, eight hundred and fifty-six.

                                    HENRY VANDERVOORT.

*James T. Brady, Horace F. Clark, Daniel E. Sickles* and *Abraham D. Russell,* for the defendants.

*A. Oakey Hall* (District Attorney) and *Stephen B. Cushing* (Attorney-General) for the people.

The People *v.* Baker.

The points of the argument sufficiently appear in the opinion of the court.

S. B. STRONG, J.   The defendants stand indicted for the alleged murder of William Poole, in the city and county of New-York.   The indictment contains as many counts as there are defendants respectively, charging each as primary, and the others as secondary principals.

The first count charges the defendant Baker as the most prominent actor, and the others as being present at the scene of the murder and aiding and abetting him.   He elected to be tried separately.   He was first tried at a court of Oyer and Terminer, held before Judge Roosevelt in the county of New-York (where the venue is laid and the indictment was found), in December last.   The trial lasted nearly a fortnight, and resulted in the disagreement of the jurors and their discharge.

His trial was again commenced at a Court of Oyer and Terminer held before me, pursuant to an appointment by the chief judge of the Court of Appeals, in the same county, on the fourteenth of April last.   Five hundred jurors had been summoned to attend the trial.   Of that number five only were sworn, the others having failed to attend, or having been excused or rejected on challenges for cause, or on peremptory challenges in behalf of the defendant. Another panel of five hundred jurors was then ordered, and they were summoned to attend on the twenty-fourth of April; on that and the next days seven of the last panel were procured, who, from their answers, appeared to be free from any legal exceptions.   One of them was excused from serving as he was conscientiously opposed to attending to any secular business on the Jewish sabbath, and it was conceded that the trial would extend beyond one such day.   The other six were sworn, when that panel was exhausted.   Another two hundred and fifty was then ordered for the twenty-ninth of April.   On the last mentioned

day the twelfth juror was obtained, there remaining in the box, when his name was drawn, about twenty undrawn ballots. The impanneling of the jury occupied nearly four days. About four hundred persons appeared; of those two hundred and twenty-two were set aside on challenge for having formed and expressed an opinion as to the guilt or innocence of the accused on trial, three were peremptorily challenged by him, twelve were sworn as before stated, and the remaining jurors were excused or eventually discharged. The trial proceeded a short time, during which two witnesses were examined on the twenty-ninth of April. On the next day one of the jurors sworn failed to attend, and it appeared, on an examination of a messenger from him, that he was confined to his bed, and probably would remain so for a considerable period, by indisposition. The counsel for Baker thereupon proposed that the trial should proceed before the eleven jurors who were then present, or that the Jew who had been excused should sit on the trial and thus complete the number, or that those who remained of the last panel should be resummoned, and that the person whose name should be first drawn should be sworn and act as the twelfth juror. These propositions were declined by the counsel for the people, and the eleven jurors were thereupon discharged.

The court then adjourned to the first Tuesday in June, and a panel of one thousand jurors was ordered. Subsequently to the last mentioned adjournment, a *certiorari* was issued by the District Attorney and allowed by Judge Roosevelt, removing the action into the Supreme Court. On the twenty-fourth of May, two motions were made at a special term, held before me, in New-York, pursuant to an appointment made by the chief judge of the Court of Appeals, and also at the request of the justices of the first judicial district, who were otherwise engaged,—one by the counsel for the prisoners, that the *certiorari* should be quashed as having been improvidently issued, and the other by the counsel for

the people, that the place of trial should be changed to some other county, on the ground that a fair and impartial trial of the action could not be had in the city and county of New-York.

The prisoners' counsel contended, in support of their motion, that a *certiorari* to remove an indictment from the Oyer and Terminer to the Supreme Court cannot lawfully issue at the instance of the counsel for the prosecution. There can be no doubt but that it has always been competent for the counsel for the crown in England, and since our revolution for the counsel for the people in this state, unless the power has been abrogated by the statutory provisions which I shall presently consider, to remove criminal actions from the Oyer and Terminer to a higher tribunal by *certiorari.* Mr. Chitty, in his valuable work on criminal law (1 *Chitty's Cr. L.*, 377), after citing several acts of parliament restricting or regulating the practice upon *certiorari* in criminal cases, says: "But these acts apply only to writs of *certiorari* on the part of the defendants, and therefore *the crown and a private prosecutor may still obtain them*, without affidavit or recognizance, unless expressly prohibited by particular statute," and he cites 5 *Durnf. & East*, 626; 6 *id.*, 194; 3 *Bosanquet & Puller*, 354; 2 *Strange*, 900–1209; *Cowp.*, 18; 1 *East*, 305; 15 *id.*, 327; *Bacon's Abr.*, tit. " *Certiorari*," *C.* And again the same author remarks (*p.* 378), the writ of *certiorari* is demandable of absolute right only by the king himself, and to him the court is bound to grant it. The English reports are full of cases where *certioraris* to remove criminal actions from the Oyer and Terminer to the Court of King's Bench (which, as to its jurisdiction in criminal cases, corresponds to the Supreme Court in this state) have been issued on the application of the officers of the crown. The case in 3 *Bosanquet & Puller* (*p.* 354), cited by Mr. Chitty, was before the House of Lords, and it was decided by that tribunal that the *certiorari* could be issued by the officers of the crown, notwithstanding general restrictive words in an

act of parliament in reference to the class of cases to which the decision referred.   The right of the prosecution to issue this process is impliedly recognized in this state in the provision of the Revised Statutes ( 2 *R. S.,* 733) that "all issues of fact joined upon any indictment shall be tried by a jury in the county where such indictment was found, unless for special causes the Supreme Court shall order an indictment *removed into that court* to be tried in some other county."   This speaks of the removal of criminal causes as an existing common law practice, and makes no attempt to restrict it.

There are several cases in our reports which sustain the right to obtain this process in behalf of the people.   In the case of *The People v. Vermilyea and others* ( 7 *Cow.,* 141), where one of the indictments had been removed to the Supreme Court by *certiorari,* the District Attorney inquired whether he should give the other indictments the same direction by issuing writs of *certiorari* for their removal to that court : to which Chief Justice Savage answered : " You must take your own course on that subject.   *You have a right to remove the other causes,* or to try them where you are, as you shall think advisable."   In the case of *The People* v. *Webb* ( 1 *Hill,* 179 ), where the defendant had been indicted for a libel on J. Fennimore Cooper, in the county of Otsego, the indictment was removed by *certiorari,* on the application of the District Attorney, from the Oyer and Terminer to the Supreme Court, and the place of trial was changed to the county of Montgomery.   In that case the *certiorari* to the Oyer and Terminer had been obtained after that court had ordered that the trial should proceed, or that a *nolle prosequi* should be entered.   It is true, as was said by the counsel for Baker on his argument, that the right to issue the writ in behalf of the prosecution was not disputed in that case; but the motion to change the place of trial, which followed it, was warmly contested, and if it had been supposed that the process had been irregularly obtained, the

The People *v.* Baker.

objection, which would have been fatal to the motion, would have been urged. The silence of the counsel and of the court was, under the circumstances, significant against the objection.

The counsel for the defendants contended that if the right to issue the *certiorari* in criminal cases, by the District Attorney, had existed at common law, it would have been abrogated by sections one and two of chapter sixty-five of the acts of 1829, and the first section of chapter twelve of the act of 1847. The act of 1829 provides (§ 1), that no *certiorari* to remove into the Supreme Court any indictment pending in a court of oyer and terminer, before trial thereon, shall be effectual, unless allowed by a justice of the Supreme Court, or (then) circuit judge; and (§ 2) that before allowing any such writ, the officer to whom application should be made should take from the defendant a recognizance with sureties, conditioned that the defendant prosecuting such writ will appear at the return day thereof in the Supreme Court, and abide the orders and rules of such court; and the first section of the act of 1847 merely exempts the defendants who may be indicted for treason, murder or arson in the first degree, and who may be in custody, from the necessity of entering into any recognizance for their appearance in the Supreme Court. If the first section of the act of 1829 had stood alone, as that merely regulated the practice, and did not purport to take away any right, it might have been construed to include *certioraris* issued in behalf of the people. But the second section, although it specifies the process in general terms, evidently refers to such as might be allowed in behalf of the defendants. The prosecution could not be required to give a recognizance for the conduct of the defendant as a condition for obtaining the writ. There is no statutory provision involving such an absurdity, except in the eighth section of the act for the prevention of intemperance, pauperism and crime (*Laws of* 1855, 346, 347), which provides that an appeal and the service of a

notice thereof shall be of no effect in behalf of the defendant or complainant, unless he shall deliver to the magistrate an undertaking to the people in the sum of $500, with one or more sureties, conditioned, among other things, that the defendant shall not, during the pendency of the appeal, violate any of the provisions of the act; thus requiring the complainant, where the appeal is by him, to become responsible for the good behavior of his opponent! . But the prohibitory act furnishes no very reliable rule for the construction of other statutes. In reference to the act of 1829, it may raise a slight inference that the Legislature by which it was passed supposed that the certiorari could be issued only at the instance of the defendant. But that could not have the effect to abrogate a preëxisting right of the people, and one, too, which might be so very essential to the due administration of justice under circumstances of frequent occurrence. In England it has been clearly settled that the rights of the crown are not taken away by any general statutory provision, unless the intention to do so is clearly and directly manifested. Thus, in the case of *The King* v. *Davis* (5 *Term R.*, 626), Judge Buller remarked that "the general rule is, that when the certiorari (in criminal cases) is taken away by act of parliament, the crown is not included in the restriction, unless there be some words in the act to show that the legislature intended it;" and Judge Grose said: "We cannot break in upon the general rule which has been so long established, that the crown is not bound by the general words of a statute taking away the certiorari, unless it appear upon the face of the act of parliament that the legislature intended that the crown should be bound." The same principle was sustained and applied to a certiorari in a criminal case obtained by the crown officers in the case of *The King* v. *The Inhabitants of the County of Cumberland* by the Court of King's Bench (6 *Term R.*, 194) and by the House of Lords (3 *Bosanquet & Puller R.*, 354). There are many other cases in the English reports to the same effect,

and the rule is well settled in the country from which we inherit the common law. In this state, where the people have acquired the rights originally appertaining to the crown of England in criminal cases, except where they are inconsistent with our form of government, or have been expressly abrogated (and neither is the case here), it is safe to conclude that the well settled rights of the public have not been taken away by a remote inference. The continuance of the right in question was recognized by the Supreme Court in the case of *The People* v. *Webb* (which I have before cited), long after the passage of the act of 1829. I am satisfied that it still exists, and the motion to quash the *certiorari* in this case is therefore denied. The indictment may nevertheless be hereafter remanded to the Court of Oyer and Terminer for trial, should the ends of justice require that procedure. (2 *R. S.*, 742, § 28.)

The most material and by far the most difficult question presented for my consideration is, whether the place of trial should be changed on the ground that a fair and impartial trial cannot be had in the city and county of New-York. There are many palpable reasons why trials in criminal cases should ordinarily be had in the counties where the transactions which gave rise to them occurred, and a change should not be made except for forcible and clearly established causes. Our statutes require that issues of fact joined upon any indictment shall be tried by a jury in the county where such indictment was found, unless, for special causes, the Supreme Court shall order an indictment removed into that court to be tried in some other county. (2 *R. S.*, 733, § 1.) Mr. Chitty says (*vol.* 1, 495) that "not very strong evidence of partiality will be required in order to induce the court to listen to the application for the removal" (to another place of trial). To that I cannot consent, nor is the position supported by the authorities to which the learned author refers. In one of the cases cited by him (*Rex* v. *Harris*, 3 *Burrows*, 1, 333), Lord Mansfield said: "There

must be a clear and solid foundation for the suggestion" (of partiality). The question as to the unfairness or partiality of a drawn juror, does not refer exclusively to his feelings, but extends to any opinion which he may have formed and expressed in reference to any material question involved in the controversy, and which may at all influence his decision. Thus, one who acted as grand juror when the indictment was found, or who (in a case involving the life of the accused) cannot, from conscientious scruples, render a verdict which would lead to the punishment of death, is disqualified, although he has no hostile or favorable feeling toward the defendant. Some of the English authorities seem to indicate that some feeling of the juror, either hostile or friendly, must be involved in the objection to render it effectual; but it has been otherwise adjudicated in this state. In the case of *The People* v. *Vermilyea*, the English and American authorities were elaborately reviewed by Judge Woodworth; and he expressed an opinion, in which the other judges concurred, that a challenge, because the juror has expressed an opinion, is for principal cause, and need not be accompanied by personal ill-will to render it valid. (1 *Cow.*, 108.) A juror should have the ability, and one who is conscientious would feel the inclination, to decide all questions of fact submitted to him, solely from a fair and impartial view of the evidence, without being at all influenced by ulterior considerations; but that would be difficult, if not impossible, where he had previously formed and expressed a strong opinion upon the matter, especially if it corresponded with the public sentiment. Let him exert himself as he may, he cannot wholly avoid the difficulty. He will, in a case where the testimony is contradictory, yield a more ready credence, and give greater weight to that which sustains, than that which opposes his preconception: such is the infirmity of the human mind, and we must take it as we find it. When the opinions extend so far as to become the general sentiment in the community where a trial of an exciting case

The People *v.* Baker.

is had, it forms a serious obstacle to the due adminis-
tration of justice, and the evil should be arrested when that
is possible. In the case under consideration there were many
circumstances calculated to attract attention, and to induce
the formation and expression of opinion, especially in a com-
munity proverbially excitable. Of these, some of the more
prominent were the public character of the deceased, and
of some of those who were present at the time when he
received his death wound, and who have been charged with
a participation in the tragedy; the singular prolongation of
the life of the wounded man with a ball in his heart; the
immense funeral procession which accompanied and followed
the body to the grave; the flight of one of the persons
charged with the homicide across the ocean; the pursuit and
capture of the fugitive under circumstances which induced
the strong condemnation of his eloquent counsel on the
argument before me; his subsequent protracted trial, and the
publication in the newspapers of the city of the testimony,
which was taken with great minuteness, of the eloquent
speeches of the counsel, and of the elaborate and able charge
of the presiding judge. It is not at all remarkable that these
circumstances should have led to the formation and expres-
sion of opinions by the citizens of New-York, especially those
who witnessed any of the exciting scenes, or who read the
newspapers. That there is a strong and all but universal
sentiment in the city as to the truth or falsity of the charge,
as it respects the defendant, Baker, was apparent from the
statements of the jurors who appeared before me. Of
the two hundred and thirty-eight who were examined, all
but sixteen had both formed and expressed opinions as to the
alleged guilt of the prisoner, and still retained them. The
number of those who passed the ordeal of a strict examination
was so inconsiderable that they could not be deemed a fair
representation of the intelligence and reliability of the class
which comprises the jurors of the county. The jurors who
were admitted may all have been respectable men. I have

no personal acquaintance with either of them, and heard nothing against any of them, except some insinuations by the District Attorney on the argument, which, as they were not supported by any evidence, cannot be regarded in the decision of the motion which is now under consideration. If, however, they were all reliable men, such a consummation was, under the circumstances, so remarkable that a similar result on any future attempt could not be reasonably anticipated.   When so few out of so large a number of jurors are at all admissible, the right to challenge twenty peremptorily, which our laws benignly secure to persons tried for capital offences, gives to the defendants almost the entire control in the selection of the jury.   In cases where all or the greater portion of those summoned are unexceptionable, the full exercise of this privilege cannot operate prejudicially; but it is quite apparent that where but an inconsiderable number is admissible it may create a very great embarrasment, and seriously obstruct the course of justice.   In this case, when the trial was before me, but three jurors were challenged peremptorily.   Ordinarily that might raise an inference that the admitted jurors were peculiarly acceptable to the defendant.   How it was in this instance I am unable to say.   Baker swears that he was unacquainted with any of the jurors and had no influence over them.   However, I am bound to consider the possible and (generally) probable effect of the existence and exertion of the privilege.   If the trial of this action should proceed in New-York, it would probably be necessary, as it was before, to summon more than one panel.   Where so many are to be selected and summoned, a considerable number of days must necessarily intervene.   During that time, the jurors already sworn must (at least under our practice) be permitted to separate and to mingle with their fellow citizens, without any restriction.   The injunction, to hold no conversation with others on the subject of the trial, may be obeyed by conscientious men; but it sometimes happens that one is sworn as a juror

who is not a conscientious man, and as to such there can be no security. Besides, there is no responsibility upon the outsiders, and the inconsiderate will express their opinions and argue to support them in the hearing of the sworn jurors. The danger of improper influences from such causes is very considerable. I am aware that some similar difficulty may occur if jurors are permitted to separate during the trial; and it was for this reason that when I proposed to introduce the practice in trials for murder in the city of New-York, several years ago, I was warned by the judges of that district that it would be a dangerous precedent. But it seemed to me then, and I still think, that scarcely any state of circumstances will justify the seclusion and confinement of the jurors, and particularly of the infirm, and of those extensively engaged in business, during a protracted trial, from the time when they are sworn until they render their verdict. The practice of thus confining them would operate very injuriously to the administration of justice, as the more reliable men would refuse to sit at all on trials for murder. The separation during the trial is so evidently just that the danger resulting from it is a matter approaching very near to a necessity; but a state of circumstances which would increase the risk should if possible be avoided. In this case, if a judgment is to be formed from the past, and it must be, it will be difficult to procure any jury, and still more so to obtain one by which a fair, impartial and effectual trial can be had in the county of New-York. Although a sufficient number of qualified jurors might possibly be found of those who might not have formed or expressed any opinion as to the guilt or innocence of the accused, yet the strong existing public sentiment must be known to them, and it will have its influence. The jurors may be charged to disregard it, but they cannot do that with all their efforts. During an experience of many years I do not remember a verdict in a criminal case, in opposition to a strong public sentiment previously entertained and generally known. If that should

be erroneous, and it sometimes is, it will probably lead to an unjust verdict. If there should be a divided sentiment, it would result in a disagreement, and the trial thus prove abortive. Whether the inability of the jury first impanneled in this action to agree upon a verdict resulted from the effect of public opinion upon the minds of some of the number cannot be certainly known. Perhaps it may be, under the circumstances, the inferable cause; but I do not place any reliance upon that. There is sufficient without it to warrant the conclusion which I have adopted, that a fair, impartial and effectual trial of this action cannot be had in New-York, and that therefore it should take place in some other county.

The counsel for the defendant McLaughlin contended, that the action should not be sent into another county for trial, as, if it should take that direction as to one, it must as to all, and nothing appeared to prove that his client could not have a fair trial in the county of New-York. It is undoubtedly true that, as to the question whether McLaughlin participated in the transaction at all, or in any manner which would make him responsible, there is no evidence that any opinions have been formed or expressed. But then when one is charged as an active participator, an opinion as to the guilt or innocence of one of the actors, and especially when all were together, must have an important bearing as to all, and it would disqualify a proposed juror who had entertained and expressed it on the trial of either of the defendants. Sergeant Hawkins says, in his work on the *Pleas of the Crown* (*ch.* 43, § 27), that "the exception to an indictor is good upon the trial of another indictment, or action wherein the same matter is either in question or *happens to be material*, though not directly in issue." The principle that an opinion as to the guilt of an associate, would exclude a juror, was sustained by the Supreme Court in the case of *The People* v. *Vermilyea and others*. There might and would, therefore, be a difficulty in obtaining a

The People v. Baker.

fair and unprejudiced jury in New-York to try either of the defendants.

It seems, from the affidavit of Baker, that he has a large number of witnesses who are poor and unable to bear the expenses of a journey to another and perhaps distant county, and that he is also destitute of property, and his counsel made a feeling appeal to me against changing the place of trial, and thereby in effect depriving him of the ability to establish his defence. This objection, if well founded, would be entitled to great consideration. The defendants should not be deprived of any legitimate means of defence, nor will I consent to do that. They must, at all events, have a fair trial. I shall, therefore, from a sense of justice evidently as to Baker, and probably as to the other defendants, require that the district attorney shall make a satisfactory arrangement for the payment, by the county of New-York, of the necessary expenses of the indigent witnesses subpœnaed by or on behalf of the defendants, or either of them, and attending at any court where the trial shall not be postponed at their instance. Under such an arrangement, it seems to me that a change of the place of trial cannot be productive of injustice. It is undoubtedly true that it is often advantageous to the innocent accused that the trial should be where they and the witnesses are known, and where the circumstances can be appreciated from local knowledge, but it is still more important that their fate should be decided by jurors selected from an unbiassed community. It can scarcely be necessary for me to say that I do not intend to impeach, in the slightest degree, the general character of New-York jurors. Their respectability and their disposition to do right are not doubted; but they, like those selected from the rural districts, may be influenced, in weighing the evidence and adopting their conclusions, by the public sentiment, when that has been strongly formed and become generally known.

Ordinarily, where the place of trial is changed, an adjoining county should be selected, and so the authorities declare.

However, there is no express limitation, and if the necessity which may require any change, should call for a more remote county, that should be selected. In this case, it is probable that the constant intercourse between the inhabitants of New-York and the adjoining counties, and the free circulation of the newspapers of the city in its vicinity, have effected an extensive coincidence of sentiment, and the embarrassment in obtaining a fair and impartial trial in any adjoining county would be very great; I must therefore direct that the trial shall be had in a more remote county. The notice of motion designates the county of Suffolk, and as no particular objection was raised to that locality, I shall direct that the trial be had there, unless the counsel for the prosecution and for the defendants shall sign a mutual consent designating some other county.

An order must be entered, reciting that it satisfactorily appears, from the disagreement of the jury first empaneled to try the defendant Baker, the prevalence of formed and expressed opinions among the many jurors who had been summoned, and had attended upon the inchoate second trial of the same defendant, and the indications which were thereby evinced that a strong sentiment as to the guilt or innocence of the defendant existed very generally among the citizens of New-York, that a fair and impartial trial of the accused cannot be had in the county of New-York, where the venue is laid, and that, therefore, the trial must be had in the county of Suffolk (or any other county which may be designated by counsel), upon the completion of the arrangements which I have designated for the payment of the expenses of the defendant's witnesses.