# COURT OF APPEALS OF TEXAS.

## GALVESTON TERM, 1880.

### BEN KREBS v. THE STATE.

1. CHANGE OF VENUE — PRACTICE. — Error in changing the venue is not available by plea to the jurisdiction of the court to which the case has been transferred. Exception must be taken and reserved in the court by which the change was ordered. *Quære:* When one of several co-defendants obtains a change of venue, does the change apply to him alone, or to all?

2. CONTINUANCE. — When one co-defendant obtained a severance from and a prior trial of another, for the purpose of procuring the testimony of the latter, if acquitted, a conviction of the latter in the trial court concludes the matter so far as the former is concerned. He is not entitled to a continuance of his case until a final decision shall be made of an appeal taken by his co-defendant from the conviction.

3. SAME. — The disposition of an application for a fourth continuance was, even before the Revised Codes took effect, a matter for the discretion of the trial court, and not ordinarily revisable on appeal.

4. SAME — EVIDENCE. — The statement of a third person that he committed the crime for which the accused was on trial was not competent evidence for the accused to elicit from persons who heard the statement made. Therefore a continuance to obtain such hearsay evidence was properly refused.

5. PETIT JURY — CHALLENGE. — Defendant cannot complain of being forced to a peremptory challenge if his peremptory challenges were unexhausted when the panel was filled.

6. DYING DECLARATIONS. — If a dying declaration was reduced to writing when made, it is not competent for the prosecution to prove it by parol without accounting for the non-production of the writing.

7. SAME. — But if the deceased made the declaration on several occasions, the fact that it was reduced to writing on one occasion does not preclude parol evidence of the unwritten declarations on the other occasions.

8. SAME. — A witness to a dying declaration may state its substance, if not able to repeat the language of the declarant.

APPEAL from the District Court of Cooke. Tried below before the Hon. J. A. CARROLL.

1

In the night of August 26, 1876, William England, his wife, and two of her children were assassinated at their home in the county of Montague. In the ensuing October the grand jury presented a number of indictments against A. K. Taylor, James Preston, and Krebs, the appellant. In one of them Taylor was separately charged with the murder of Mrs. England, and in another Preston and Krebs were jointly charged with the same offence. A third charges Krebs and Preston jointly with the murder of William England, and upon it Krebs was convicted of murder in the first degree at the fall term, 1876, of the District Court of Montague County. Upon his appeal to this court, that conviction was set aside. 3 Texas Ct. App. 348. The present appeal, however, does not arise from a second trial upon that indictment, but from a conviction of murder in the first degree upon the indictment for the murder of Mrs. England. This conviction was had in February, 1879, at a trial in the District Court of Cooke County, to which the cause was transferred in 1877 by change of venue.

The defence filed a motion for a fourth continuance, which was partly predicated on expected testimony of Joseph and Wilborn Cothrum and John Walker. The last named, it was alleged, would testify that early in the morning after the murder of the England family, Bill Taylor, accompanied by one Charles Hall and another person, passed his (Walker's) house, and informed him of the murder, exhibiting a bright-barrelled six-shooter which he said was at the shooting. The two Cothrums were expected to testify to the same effect, with the addition that Bill Taylor said that he was at the murder and fired the pistol, and that Hall and another person assisted in the slaughter.

Harvey Taylor, a son of Mrs. England by a former husband, was the first witness examined by the State. He was an inmate of the England household in August, 1876, when the assassinations were perpetrated. He testified

that he, together with the four members of the family who were murdered, sat up to a late hour, talking about the approaching marriage of Isaiah D. Taylor, witness's brother. At length his step-father, William England, said it was time to go to bed, and, after family prayer was over, witness made his pallet down on the porch. After he lay down he observed three men coming down the road which leads from the town of Montague. When he first observed them they were within two or three steps of the front gate. One of them was smaller than the others, and had something tied on his head. Witness at first took them to be three of his brothers, who had gone out to sleep upon their preemption claims. They were bending over, as if to hide their faces. After they came in at the gate, the smallest of the three, who was in front, came on the porch and presented a bright pistol in witness's face, and said, "G—d d—n you, get into the house!" Witness ran into the house, and the man followed him and shot Isaiah D. Taylor, who was standing in the doorway between the north and south rooms. Witness ran through the house and out through the cotton-field, and went to Mr. Williard's, about three-quarters of a mile distant. The tall young man who came on the porch looked like Bill Taylor, who, though taller than A. K. Taylor, his brother, resembled him in features so much that they might have been twins. When witness ran in the house he saw his mother and his sister Susie standing in the corner, barefooted, and preparing to go to bed. After he left the house he heard pistols shooting, men cursing, and his mother and sister screaming. After he reached Mr. Williard's and informed him, they went to the England place, and witness found his sister lying dead on the walk between the house and the front gate, and his step-father, William England, lying dead, with his body in the house and his head on the front porch. Witness did not see his brother Isaiah until the next morning, when he saw him lying dead in the road, outside the fence. He found

his mother, Mrs. Selena England, mortally wounded. The house had four rooms, two in the front and two in the rear, with a porch in front of the house. Nothing more was elicited in the cross-examination of this witness.

E. T. Vanhoozier, for the State, testified that in August, 1876, he lived on Denton Creek in Montague County. Defendant, Krebs, was a neighbor, and lived about half a mile from the England place. Witness was at the England place about two hours after Mrs. England was shot. Mr. Musick came after him to go and help Mrs. England, and on going to Mr. Musick's he found her there, lying on the floor, bleeding. Witness asked her if she was shot, and she said she was, and could not live long. She then proceeded to state how she came to be shot. She was of sane mind, conscious of approaching death; had no hope of recovery; made the statement voluntarily and without persuasion, and not in answer to interrogatories tending to lead to any particular statement. She said that they were at prayers; that a man came into the house and shot Isaiah; that she and her daughter Susie ran out at the back door, towards the cow-lot gate; that old Ben Krebs followed them, shooting at them; that before they got to the cow-lot gate Krebs headed them off, and they turned and ran back to the house, to come in at the front gate; that when she got to the gate Ben Krebs shot her, and she fell against the fence; that she then heard Susie say, "O mother! old Ben Krebs has come to kill us all;" that she heard her husband calling her in the house; that she went into the house, and there she saw a man pulling back the head of Mr. England and cutting his throat; that Ben Krebs followed her, and she ran out through the house into the garden, where she pulled up a picket, and from there went to Mr. Musick's.

The witness stated that Mr. Musick and his wife were present when the foregoing statement was made by Mrs. England. He went to the England place, and there found

Susie Taylor dead on the walk between the front porch and gate, " where Mrs. England told me she was killed." William England was dead, with his head on the porch and his body in the north room of the house. He was shot and his throat was cut; the blood was spattered on the floor. Witness examined where Mrs. England said Isaiah D. Taylor was standing when he was shot, and found a pair of boots sitting there, near the door leading from the north to the south room, and also found blood where Mrs. England said Isaiah had fallen. He did not find Isaiah that night, but found him the next morning, lying about thirty-seven steps from the house, and in the road between England's and Krebs's. He was barefooted.

On his cross-examination, this witness repeated nearly all of his foregoing testimony, and, with reference to Mrs. England's statement, added that she said she was certain it was Ben Krebs who killed her family, for she knew him by his hat, his clothes, and his Dutch talk, and at one time was so close to him that she could have put her hand in his beard. She said that if the man who cut her husband's throat was not a Dutchman who got a drink at her house the previous evening, she did not know who he was. She hesitated once, and asked Mr. Musick who he saw at Krebs's house that Saturday evening, and when Mr. Musick replied that he only saw Krebs and his family, James Preston, and A. K. Taylor, she asked him if he did not see a strange man there, and said she had seen some man ride up to Krebs's house late on Saturday evening. She described to witness the several points at which her husband, herself, and her son and daughter were when assailed, and witness found blood and other indications in conformity with her representations. When witness first went to the England place, about midnight or after, he was accompanied by two men whom he did not then know, but thinks they were men who were looking for land in that neighborhood. No other persons came until near daylight, except some one who

came from Musick's to get some oil with which to make a light by which Dr. Stinson could dress Mrs. England's wound. About daylight several persons came, and by eight or nine o'clock in the morning there was a considerable party there. Krebs and Preston came there about eight or nine o'clock.

Dr. J. E. Stinson, for the State, testified that he lived in the town of Montague, and knew Mrs. Selena England, who died on the 28th of August, 1876. He was called to see her the night before she died, at the house of John Musick, about seven miles from town. The messenger who came for him arrived before midnight, and he reached Musick's as soon as he could saddle a horse and ride there. He found Mrs. England there, and examined her wounds. She was perfectly sane, entirely conscious of approaching death, had no hope of recovery, and said it was best she should then make a statement about it. Her statement was voluntarily made, without being drawn out by questions, and after witness had warned her of the danger of causing the hanging of some innocent man.

Mrs. England's statement, as related in this witness's testimony, was as follows: "Her statement was that on that night the family had set up rather late; that they were talking about their son Isaiah Taylor's marriage; that they finally had prayer, and the family were preparing for bed when some one came in and shot her son Isaiah. She said she and her daughter ran out at the back door; that old Ben Krebs followed, cursing and talking in his Dutch talk, saying, ' D—n you, I intend to kill you.' She said that after she was shot by Krebs, she heard her daughter Susie say, ' Old Ben Krebs has killed me;' that after Mrs. England was shot, she heard her husband, who was still in the house, cry out that they were killing him. She said, before she heard his cries she and Susie had run around from the back yard, in front of the house, and that she hurried and ran through the house, and there saw her husband

sitting in a chair, with a man at his back holding his head back by his hair, cutting his throat, and that she heard the man say, 'I will kill you,' and 'Now I will do it;' that, after going through the house, she pulled a picket off from the fence and made her escape from the place, wounded as she then was. That the man who was cutting her husband's throat was either old Preston or a Dutchman who had stopped at her house the evening before and inquired the way to Ben Krebs's."

Proceeding with his testimony, Dr. Stinson stated that he went over to the England place and there saw the bodies of William England and Isaiah and Susie Taylor. Mr. England had received two mortal wounds, one by a gun or pistol ball, which entered near the lower part of the breast-bone, ranged downward, passed out at the back, and lodged in his shirt. The other wound appeared to have been made with a knife, or some sharp instrument, on the neck. Susie Taylor was shot in the back with a gun or pistol ball, which came out about four inches above the left nipple. Isaiah Taylor had a similar wound, which passed through. Mrs. England was wounded with a gun or pistol ball, which entered below her right shoulder-blade, came out near the navel, and caused her death a few hours afterwards. Witness picked out two bullets from their lodgments in the wall of the England house, and found two exploded caps upon the floor. The two bullets were about the size of the round balls used for Colt's navy revolvers. They appeared to have been moulded, and were slightly mashed. Witness thought he saw traces of where their necks had been cut off when they were taken from the mould. He also found the metallic hulls of two cartridges which had been discharged; also a large conical ball which had lodged in Mr. England's shirt after passing through his body; and also another large ball, which was picked from the wall of the house.

This witness went to Krebs's house the day after the murders, and a day or two subsequent to the arrest of Krebs

and Preston he went there again to 'search for arms. Lying on or under some clothing, in a cupboard covered with calico curtains, he found a Colt's navy revolving pistol. Two chambers of its cylinder were empty, and four were loaded with round, moulded bullets. He also found at Krebs's house a small breech-loading rifle, but the cartridge hulls found at the England house did not fit it. He also found a double-barrelled shot-gun, and in a trunk a small pistol. He found also a colored hickory shirt, dirty, rolled up, and lying on some planks which were supported by poles, some six feet above the floor. There were no other garments where it was found. There were some spots on it, which witness took to be blood. It was a new shirt, and had not been long worn. At the England house he saw some grass rope, fifteen or eighteen inches long, but did not know how many pieces of it there were. Mr. Nix and Mr. Miller went with witness to Krebs's house.

On the cross-examination of this witness, he identified a shirt produced in court as the one he found at Krebs's house, and which appeared unchanged except by time and frequent handling. He recognized a hole in it made by himself, where he cut out a small piece on which was one of the spots which he took to be blood. He could not see any bloodstains on the shirt. Some cartridge-hulls and some balls were identified by him as those he got at the England house, and some round balls as the same which he took from a bullet-pouch at Krebs's. The rifle which he found at Krebs's, and said to be Preston's, was sitting near the door. When he asked for arms at Krebs's, a little boy brought him an old pistol, without mainspring or cock. He could not tell from the appearance of the Colt's pistol there found how long previous the two empty barrels of the cylinder had been discharged, except that it must have been done within a few days. Mrs. England and Susie Taylor, when found, were barefooted.

C. G. McGuire, for the State, testified that Mrs. England

was shot on Saturday night, August 26, 1876, and died the next Monday morning, the 28th of the same month. Witness heard of the murders after breakfast on Sunday morning, and went to the England house, reaching there about eight or nine o'clock. Krebs and Preston came there about the same hours, but after witness had got there. He was sitting outside the yard, on the wood-pile, when they came up the Montague and Decatur road from the direction of Krebs's house. As they passed by the body of Isaiah D. Taylor they shied off from it, turned, and hesitated a moment, looking at the body, which lay eight or ten feet from the fence, and between which and the fence there was a footpath they might have taken. Witness noticed Krebs's appearance; he was pale, and his hand trembled. He and Preston spoke of the occurrence, and said they were at Krebs's that night, and had heard the noise. Krebs had on a checked shirt which looked like it had been worn several days.

Witness searched for tracks of the assassins. Inside the enclosure, and east of the house, he found three footprints, two of which were small, barefooted tracks, of a size corresponding to number five or six shoes. The other was a shoe-track, about number eight or nine, and indicated that the heel of the left shoe was slightly run down. The persons who made these tracks were running, as their appearance showed. They all went towards the lot gate, but finally turned back towards the house. Witness saw what he took to be the same shoe-track inside of the cow-lot, and also in the cotton-patch, where two other sets of shoe-tracks were also found. One of these two appeared to be about half an inch longer than the shoe-track found in the enclosure along with the barefoot tracks, and had apparently been made with a coarse, broad-bottomed shoe. The other was about a number six in size, with a small heel. In the cotton-patch the tracks led about in various directions, and each was trailed by some of the party engaged with witness

in the search.   He and Mr. Matlock followed the track with
the run-down heel through the cotton-patch and to the fence,
and then went towards and across the road.   They did not
find it to cross the road, but found it afterwards in Krebs's
field, where it was approached by the other two tracks, and
they all came together at a short distance from Krebs's
house.   Within twenty-five yards of Krebs's house the tracks
were lost in the high grass.   Witness had a measure on a
stick, which he repeatedly applied to the track he followed,
and the track appeared to be the same all the way.   He
never measured the shoes of Krebs or of Preston.

On his cross-examination, the witness stated that it was
about noon or later on Sunday when the search for tracks
was made, and after the arrest of Krebs and Preston.
Some of the tracks appeared to have had rain-drops in
them, but there was a sprinkle of a few drops of rain about
noon of that day.   He still had at his home, in Montague
County, the measure which he applied to the footprints,
but did not think to bring it with him to court.

A. S. Matlock, for the State, testified that he was county
attorney of Montague County in 1876.   About seven o'clock
on Sunday morning, August 27, 1876, he was told that the
England family had been murdered, and, learning that no
steps had been taken to arrest the guilty parties, he imme-
diately got his horse, and, taking Mr. Morris with him, went
to the England place, and found fifty or more people
already there.   He at once went to Mrs. England, who was
in a back room of the house, mortally wounded.   Kneeling
down by her, he asked her in a whisper if she knew who
did the deed.   She said that she did; and that the killing
was done by Ben Krebs, and either James Preston or a
Dutchman who had stopped at her house the previous even-
ing and asked for a drink, and by a tall young man whom
she did not know.   Witness then left her, and among the
assembled people found Krebs and Preston.   He arrested
them, and then went some two and a half miles and arrest-

ed the Dutchman to whom Mrs. England referred. He insisted upon being taken into her presence, which was done, and she immediately said he was not the man.

The testimony of this witness, as it appears in the record, next proceeds to lay the predicate for the dying declaration of Mrs. England, and then the declaration itself in detail. For the most part it was, as recited by him, the same in substance, and almost in words, as the version of it given by Dr. Stinson, already set out in full. In addition, however, to that version of it, she stated to this witness, Matlock, that when, at her husband's call, she ran back through the house, she passed him so close that her dress brushed his knees. She also stated that when she and Susie Taylor ran out of the house, and Krebs pursued them, Susie exclaimed, " O mother! Ben Krebs has come to kill us all," and that Susie, immediately upon being shot by Krebs, exclaimed, " O mother! Ben Krebs has killed me."

The witness Matlock had Krebs brought before Mrs. England for identification. They spoke to each other, and then she said, "Mr. Krebs, don't you feel very bad about killing my husband and my poor children?" Krebs denied the charge, and said, " It must be your imagination." He repeated this several times, and Mrs. England then said that she was not mistaken; that he was the man who did it; that she knew him by his whiskers, by his Dutch talk and curses, and even by that old white hat he then held in his hand. Krebs was then removed from her presence.

The witness stated that he next proceeded to see if Mrs. England's statement was true. He found the bodies of William England and Isaiah and Susie Taylor at the localities already described by other witnesses. Taking with him the witness McGuire and four other men, they proceeded to search for tracks. At the north end of the house, and near the chimney, a track was shown them as that of one of the murderers. By measurement they found it to

be the track of a number eight or nine brogan shoe, with the left heel slightly run down. Proceeding next to the vacant lot, where Mrs. England said she and Susie ran barefooted towards the cow-lot gate, they there found three tracks, — two of them being small, barefooted tracks, and the third a shoe-track. The tracks went towards the cow-lot gate, but before reaching it the shoe-track seemed to head off the barefooted tracks, and the latter to turn back towards the house. The tracks appeared to have been made by persons who were running. The shoe-track which followed the barefooted tracks was measured, and was found to have been made by a person whose left shoe was slightly run down, and to correspond in size and appearance with the track at the north end of the house. The same track was found and measured in the cow-lot, and next in the cotton-field, in which two other tracks were also found. One of these two was that of a brogan shoe, about number nine or ten, with broad heels and bottoms, and the other the track of a number five or six boot or shoe with a small heel. Witness measured each of these tracks where he found them starting in the direction of Ben Krebs's house. These several tracks diverged from each other after leaving the England place, until they got some distance. Witness and McGuire followed the track first seen near the chimney of the England house, measuring and comparing it at various places. Each of the two other tracks was followed by two others of the party. In his further account of the tracks, this witness entirely accords with the testimony of McGuire, already given, except that he puts the point where the tracks were finally lost at a distance from Krebs's house of fifty yards, instead of twenty-five as estimated by McGuire. The shoes worn by Krebs and Preston were not fitted into these tracks, because they had already been sent on to the town of Montague in charge of a guard.

On the next day the prisoners were taken from the jail to

the court-house, for the purpose of an examining trial, and to the tracks made by them on their way the witness applied the same measure he had used the preceding day. The track made by Krebs he took to be the same track followed by him and McGuire at the England place. It was that of a number eight or nine brogan, and that of the left shoe presented the same slightly run-down appearance. The track made by Preston corresponded with the largest of the three shoe-tracks found at the England place. Subsequently the witness went to the jail and called for the shoes of Krebs, Preston, and A. K. Taylor, and applied to them the same measure and with the same result, — finding Taylor's shoes to be number six brogans, with long and small heels like boot-heels. Krebs's foot was longer than Preston's, but the latter's instep was higher and his shoes longer than Krebs's. The measure used by the witness was a stick.

This witness further testified that at the time of the murder of the England family a charge of aggravated assault was pending against Krebs, and William England and his wife were the witnesses against him. It was never tried, because they were killed.

Harvey Taylor, recalled by the State, testified that there was ill-feeling between Krebs and the England family. It arose in June, 1876, about Krebs dogging England's live stock for getting in his field. Krebs and Mr. England had a quarrel about it, and Krebs drew a pole as if to strike Mr. England with it, but did not do so. There was a fence between them, Krebs being in his field and Mr. England outside. A complaint against Krebs was sworn out by Mr. England. After the fuss between them, Krebs took witness down on the creek, and said he had nothing against him, and did not want to talk to Mrs. England; but as for Mr. England, hell was already hot for him.

W. W. Richie, for the State, testified that in August, 1876, he was in Montague County, looking for some school-land, and had been referred to Mr. Krebs for information

about its locality.   Late in the afternoon of the 26th of that month he rode up to Krebs's house, and there saw Krebs, his family, and James Preston.   As witness rode up, a youth, who he had since learned was A. K. Taylor, and Johnnie Savage, Krebs's step-son, were going out hunting, as they said.   Taylor had a shot-gun, and Johnnie Savage a revolving pistol like one of Colt's, in his hand.   Witness remained but a short time and left.   This was about half an hour before sunset.   On cross-examination, this witness stated that he saw Krebs the next morning at the England place, and observed no difference between his conduct and that of other persons there.

J. Stroud, for the State, testified that in June or July before the England family were killed, he was going in quest of a thresher and met Krebs and his wife.   Witness stopped to ask Krebs about the thresher, and while they were talking Isaiah D. Taylor passed them.   After Taylor had passed, Krebs said to witness, " The first chance I get at that d—d rascal I will clean him up."   This was the only threat witness heard Krebs make, and he knew nothing more about the state of feeling between Krebs and the England family.

D. H. Williard, for the State, testified that he went to the England house the night the murders were committed, and after they were committed.   He found there eight pieces of new rope, like strands made for hobbling horses.   The rope was unplatted, as if to be used for hobbles.   There were eight persons in the England family.   On cross-examination, he said the pieces were about three feet in length.   He did not think they were made to hang with.

A. G. Crowell, for the State, testified that in the evening preceding the Saturday night in which the England family were murdered he saw Krebs buy a new rope from F. H. Jones, at the latter's store in the town of Montague.   Witness could not say how much rope there was, but heard Krebs call for rope, and Mr. Jones reply that he had none, but could go out and get it for Krebs ; and witness remained

in the store until Jones went out and brought back the rope to Krebs. Witness thought it was inch or inch and a quarter rope.

W. A. Nix, for the State, testified that he heard Krebs talking with Mr. Musick in Hammond's blacksmith-shop in the town of Montague, perhaps two or three weeks before the murder of the England family. Krebs was talking about his troubles with the England family, and said something about old man England prosecuting him for an assault upon him. Krebs had a stick in his hand, showing what he did with it in his affray with Mr. England. He was angry and cursing, and said that before he would be sent to the penitentiary on their oaths he would kill them. Witness was not more than four or five feet from Krebs when the latter was talking thus. Albert Hammond was shoeing a horse in the shop at the same time.

Albert Hammond was introduced by the State, and testified to the same effect as Nix. And upon this proof the State rested.

Mrs. John Musick was the first witness introduced by the defence. She testified that she and her husband heard Mrs. England calling him, Mr. Musick, as she came towards their house the night of the murders. Mr. Musick and witness got out of bed and went out to meet Mrs. England. Mr. Musick got to Mrs. England before witness, because she had stopped to dress and get the children up. Mrs. England and Mr. Musick had some conversation before witness reached them. Mrs. England told witness that all her family were killed except Joseph, Isaac, and Burch Taylor, who were not at home. She said one of the men was old Ben Krebs, and that she did not know the man who killed Mr. England, but that he was about the size and age of Preston. She related the circumstances several times, and said that Krebs came in and presented his pistol at Isaiah D. Taylor, and shot him; and that she and Susie Taylor ran, and Krebs followed and shot her, and she asked him to shoot her no

more. Harvey Taylor came to the house of witness that night, and she heard a conversation between him and his mother, Mrs. England, who told him she thought he was killed. Harvey Taylor said that the man who came up to him on the porch and presented the bright pistol at him, and who shot Isaiah, looked to him like Bill Taylor, and one of the others looked like John Musick. Mrs. England told Harvey to hush, — that Musick was at home when she came to his house that night.

On cross-examination, this witness stated that Mrs. England said it was Krebs who shot her, and she knew his voice; and that the man who killed her husband was about the size and age of Mr. Preston, and looked like Mr. Preston, but that she would not say that it was or was not Mr. Preston. Witness thought the Krebs family were at home that night, and that Preston and A. K. Taylor were the only persons at Krebs's besides the family.

John Musick, a witness for the defendant, not being in attendance, the State consented that the defence might read in evidence his testimony on the trial of James Preston at the July term, 1878, as set forth in the statement of facts made up in that case. It was to the same general purport and effect as that of his wife, above set out. He was positive that Mrs. England stated that Isaiah D. Taylor, as well as Susie, was killed by old Ben Krebs, and that she saw Isaiah fall at the side door, and saw him when she passed through the house the last time. And in reply to an inquiry of Mr. Vanhoozier, she stated that if Preston was there she did not know him; that the man who was cutting Mr. England's throat had a rag around his head, and she did not know who he was. Witness further stated that Preston and the England family were on friendly terms previous to the killing. In the preceding spring, Mrs. England and Susie waited on Preston's wife during her last illness, and Mr. England preached her funeral sermon. Preston, after his wife's death, moved to his son-in-law's,

eight or nine miles distant, but would come back to see to his crop upon his place, and when he did so he and his boys eat and slept at Krebs's. Preston had a small cartridge-gun, but it would not chamber the large cartridges and balls exhibited to witness in court.

S. J. Poland, another witness for the defence, being also absent, his testimony at Preston's trial, in 1878, was, by consent of the State, put in evidence. He was well acquainted with the England family and Preston, and knew them to be on good terms. England's wife and step-daughter nursed Preston's wife in her last sickness, and England preached her funeral in the May next before the murders. Witness heard Mrs. England make statements at Musick's as to who shot her and murdered her family. She said it was Ben Krebs who shot Isaiah, Susie, and herself, and that who it was that killed Mr. England she did not know, but it was "an oldish-like man, about like Mr. Preston." Witness asked her if it was Preston, and she said no, that she could not say it was Mr. Preston, and that she did not think he was that sort of a man; but that her first thought was that it was a Dutchman who stopped at her house the day before. She said she knew and recognized Krebs, but referred to Preston only by way of describing the man she did not know. Witness asked her if it was Preston because he had heard that Krebs and Preston were accused. Witness saw the Dutchman and Krebs when they were severally taken before her, but did not hear what she then said. In describing the man who killed her husband, she said he had rags in his whiskers, and said she knew Krebs's white hat and Dutch talk. Witness lived on a road which, in about two and a half miles, entered the Montague and Decatur road near the England place; and about ten o'clock of the night of the murders he saw two or three men pass his house on horseback, going towards Montague town, but he did not recognize them. The Dutchman who was taken before Mrs. England was about five feet six inches high and

about one hundred and seventy-five pounds weight.    Preston is about six feet tall, and not so gray as the Dutchman.

Mrs. Williard, also a witness for the defence, was absent, and her testimony at Preston's previous trial was in like manner introduced.    She went to Musick's house and saw Mrs. England there after she was shot, and was told by Mrs. England how she received the wound.    Mrs. England stated that old Krebs shot her, Susie, and Isaiah, and that she did not know who the other men were.    She would not say positively, but said she thought it might have been Preston and a Dutchman who were with Krebs at the time of the killing.    Witness was certain that Mrs. England's words were, "Preston *and* a Dutchman," and not "Preston or a Dutchman."    Though witness did not hear all that was said by Mrs. England, who was talking all the time, she recollected that Mrs. England accused Krebs, but was not positive as to who the other men were.

J. A. Gardner, another witness for the defendant, being also absent, his testimony at Preston's former trial was admitted with the consent of the State.    According to his version of Mrs. England's statement, Krebs was the only one of the three assassins whom she said she knew, and the man who cut her husband's throat was an old-like man about the size of Preston, and a little bald, and either Preston or a Dutchman she had seen the day before, and who had inquired the way to Krebs's.    This witness aided in the search for tracks in the premises of England and the field of Krebs, and he also compared the measures there taken with the tracks and shoes of the parties charged with the crime.    On these matters his testimony appears in all substantial respects to accord with that of the State's witness Matlock, already given ; but he added that he saw no indications that any of the tracks were made with half-soled shoes.    He followed the largest of the three tracks, which was taken to be Preston's.

Thomas Savage, for the defendant, testified that on Sun-

day morning, August 27, 1876, he started off about eight
or nine o'clock, to carry information of the murder to Mc-
Guire and others.   Passing Krebs's place, witness informed
him, and Krebs expressed surprise, and said he would go
over to England's as soon as Preston should return from
looking for his horse.   Witness met Preston about two
hundred yards from Krebs's, and also informed him.
Neither in Krebs nor Preston did witness observe any
change of countenance ; but Preston said he had heard some
shooting in the night.   At Krebs's house witness saw only
Krebs, his wife, and some of the children, and was told
A. K. Taylor and Johnnie Savage were out hunting the
ponies.   A. K. Taylor lived at witness's house, but had
gone over to Krebs's, carrying no arms from witness's.   He
was a boy about sixteen years old ; wore number six bach-
elor brogan shoes ; and when he first came to witness's, was
the owner of a pistol, but witness refused to let him keep
it, and he took it over to Krebs's.   On the cross-examina-
tion, this witness said he was a step-son of Mrs. Krebs by
her first husband.

Gus White, for the defence, testified that he lived about
half a mile from England's, and about as far from Krebs's.
On Saturday, August 26, 1876 (in the night of which day
the murders were committed), he went in Krebs's wagon
to the town of Montague.   Krebs, Mrs. Krebs, and Johnnie
Savage, their little step-son, accompanied witness in the
wagon.   Witness noticed that Krebs had on a clean striped
cotton shirt that day, and that it looked like it had just
been washed and ironed.   Krebs had in his wagon some
grist for the mill.   They started back home about noon, and
got to witness's house when the sun was about two hours
high.   Krebs did not stop there, as he said that Preston
was at his house, and was expecting to go over on Sandy,
eight or ten miles distant.   Witness noticed that Krebs
bought some tobacco and coffee in town, and Mrs. Krebs
showed witness some calico which she said she had bought ;

but witness saw no rope or other article, except a bag of meal, during their return from town. Witness was a brother-in-law of Krebs, and also of A. K. Taylor. On cross-examination, he said Krebs might have had rope in the wagon without it being seen by him. The shirt worn by Krebs when he was arrested was a dirtier one than that he wore to town.

L. F. Fisch, for the defence, testified that he met Krebs, Mrs. Krebs, Johnnie Savage, and Gus White going in Krebs's wagon to the town of Montague on the occasion mentioned by White, and witness noticed that Krebs had on a clean shirt. Witness was then going with a Dutchman to show him the way, as far as Krebs's, to the Dutch settlement. The Dutchman could speak scarcely a word of English, was not more than five feet four inches high, heavy built, would weigh two hundred pounds, and bore no resemblance to Preston, who is about six feet in height. Witness did not know that this was the same Dutchman who was arrested on the following day, but was afterwards told by him that he had been arrested and discharged.

L. N. Perkins, for the defence, testified that he was sheriff of Montague County while Krebs and Preston were in jail there. A constant guard was kept at the jail while they were confined there. When put in, they both had on large shoes, and A. K. Taylor light brogans with small heels. Witness could not say that the shoes now shown him from Krebs's feet are the same worn by Krebs when taken to the Montague jail, the left one of which he thought was slightly run down at the heel. In those now shown him very little difference in the heels is apparent. Witness furnished no shoes to those prisoners, and knew of no repairs having been done for them while in his custody. Any such repairs would, if done, be known by some of the guards, of whom he had quite a number, and he named five. Two of the five were introduced, and testified to the same general effect as Perkins.

Charles Hunt, for the defence, testified that he was a guard at the Cooke County jail when Krebs and Preston were first brought there from Montague, and that the shoes now shown are the same worn by Krebs when brought over. Krebs's shoes and feet are longer than Preston's; witness had measured both. The witness thought that the half-soles on Preston's shoes had been put on them since he was first put in the Cooke County jail, and when he was taken therefrom to Montague County by Sheriff Perkins, and after-wards brought back to Cooke.

T. H. Feathers, for the defence, stated that he was a shoemaker, and at the July term, 1878, had measured the feet and shoes of both Krebs and Preston. Krebs's are about two numbers larger than Preston's, but which had the higher instep the witness did not remember.

Harvey Taylor was introduced as a witness for the defence, and stated that he knew Bill Taylor well, but had not seen him for about a year before the murders. He was a tall young man, about twenty-six years of age, with light hair and mustache. In features, his brother, A. K. Taylor, was as much like him as if they were twins, but was not as tall by a head, was not grown, and had no beard or mus-tache. When the three men came in front of the gate, witness thought they were his three brothers. When he started in the house, two of them were still at the gate, which was about twelve steps from the porch. The one who came in to where witness was appeared to be the tallest of the three, and witness thought it was Bill Taylor. This man followed witness into the house, and shot Isaiah, who staggered. Witness ran through the house as fast as he could, and turned east into the corn-field. He heard the women screaming and the men cursing and shooting; and thought he heard as many as three voices cursing, and eight or nine shots fired. Witness had known Krebs and his family intimately for about three years, and Krebs and the England family had been on good terms until the fall-

ing out about the stock. Witness did not recognize Krebs as one of the three men, but they turned their faces and stooped as they approached the gate. The night was clear and the moon shining. The two men who stopped at the gate had on hats ; the other wore no hat, but had a rag tied around his head. After witness had escaped from the place, he thought one of the men was Mr. John Musick, a near neighbor. He could not say whether the mustache on the man who came on the porch was real or false.

Johnnie Savage, for the defence, stated that he was about fourteen years old, a step-son of Krebs, and lived with Krebs when the England family were murdered. On the day of that event he went in the wagon with his mother, Krebs, and the witness White to the town of Montague, and remembered that Krebs put on a clean shirt in place of the one he had been wearing, which was a new hickory shirt and the one exhibited in court. Preston had been staying at Krebs's for about three days, looking after his crop, and he and A. K. Taylor were at Krebs's the night of the murders. No one else was there except Krebs and the family. On Friday, as witness thought, Mr. Preston went hunting and brought back two turkeys, and Krebs cleaned, skinned, and hung them up on the stable door. The pistol taken from Krebs's by Dr. Stinson, and shown in court, belonged to witness, and he had it when he went hunting on Saturday with A. K. Taylor, who had no fire-arms but took Krebs's shot-gun. A. K. Taylor had once owned the pistol, but sold it to Krebs, who let Jeff Hagler have it, and witness traded with Hagler for it. The Saturday night of the murders, A. K. Taylor slept with witness and his little brother. After they had gone to bed, and about eight or nine o'clock, as the witness thought, he was awakened by the firing of some eight or nine shots in the direction of Mr. England's. Krebs, Preston, A. K. Taylor, and witness went out in the yard, listened some time, and went back to bed. Mrs. Krebs also got up, and

witness's sister Mary Jane was awakened, but did not get up. The next morning, witness and A. K. Taylor went to hunt for the ponies, and Preston to hunt for his horse. When witness got back, he was informed that Thomas Savage had come by the house and told what had occurred at Mr. England's.

On cross-examination, the witness said he did not remember what Krebs and Preston said about the noise ; but they, as well as himself and A. K. Taylor, had on thin pants when they went out into the yard. Before the shooting, he had been awakened by the pony jumping the fence and knocking off a rail, but he did not then get up. He stated that he had testified at former trials of this case, but could not remember what he stated on those occasions.

Mary Jane Savage, for the defence, testified to the same statements as Johnnie Savage.

Mrs. Rhoda A. Krebs, wife of the defendant, also testified to the same matters, and exhibited in court the shirt which her husband put on to go with her and Johnnie Savage in the wagon to Montague town, and which he had on when arrested the next day. She got it at the jail, a few days after his arrest.

This closed the evidence for the defence.

In rebuttal, the State examined Hiram Jones, who testified that when Krebs was brought to the Cooke County jail, witness was a guard there, and he, together with Mr. Hunt, another guard, examined the shoes of Krebs and Preston. At that time Preston's shoes were not half-soled, — at least the one examined by witness was not, — and now they both are half-soled. They were not repaired or half-soled in Cooke County, so far as witness knew. This concluded the evidence admitted to the jury.

Notwithstanding a skilful, vigorous, and resolute defence by eminent and indefatigable counsel, the defendant was found guilty of murder in the first degree, and judgment of death was rendered upon the verdict, conformably to the

law in force at the date of the murder and the time of the trial. He appealed on grounds which are clearly disclosed in the opinion of this court, and which, on the hearing of the appeal, were ably presented both by brief and oral argument. Immediately following this case will be found that of James Preston, and in volume 3 of these Reports, at page 169, that of A. K. Taylor.

*W. J. Sparks, Grigsby & Willis*, and *N. P. Jackson*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

White, P. J. On the thirty-first day of October, 1876, the grand jury of Montague County returned into court a bill of indictment charging this appellant and one James Preston with the murder of Selena England on the previous twenty-sixth day of August. At the June term, 1877, Preston applied for a change of venue in the case, on account of the prejudice existing against him in Montague County; and upon the hearing of this application the court made its order in the following words, viz.: " Then came on to be heard the defendant's motion for a change of venue, and after hearing said motion, and argument of counsel thereon, it is the opinion of the court that *the defendants* cannot have a fair and impartial trial in Montague County. It is therefore ordered and decreed by the court that said motion for change of venue be sustained and granted, and that said cause be transferred to the next term of the District Court of Cooke County, Texas," etc. At the time this order was entered, no severance had been applied for by defendants, and the defendant Krebs interposed no objection to the order, though the judgment recital shows that he was present in court both in person and by attorney. · In the District Court of Cooke County the defendant Krebs filed a plea to the jurisdiction of the court, to the

effect that he was not a party to and had never applied for or consented to the change of venue, and that in so far as he was concerned his case was still of right pending in the District Court of Montague. The plea to the jurisdiction was overruled by the court, and this ruling is one of the main errors complained of on the appeal here presented.

Were this question properly before us for revision, we might find some difficulty in its solution, our statute being defective in that it does not prescribe the proper proceedings in such cases, and the decisions of the courts of other States where there is a like defect in their statutes not being uniform as to the practice. It is held in New York, for instance, that where the indictment is against several persons, and enough is shown on the part of the prosecution to make a change of the place of trial proper as to one defendant, the change will be made as to all the defendants although it is a case in which every defendant is entitled to a separate trial. *The People* v. *Baker*, 3 Park. Cr. 181. On the contrary, in Missouri the rule is that where two are jointly indicted, and only one applies for a change of venue, an order removing the cause will be effectual only as to the one so applying. *The State* v. *Wetherford*, 25 Mo. 439. And this same doctrine is positively announced in *The State* v. *Denton*, 6 Coldw. 539, and practically recognized as correct in *John* v. *The State*, 2 Ala. 290; *The State* v. *Martin*, 2 Ired. (N. C.) 101; *Clark* v. *The People*, 2 Scam. 117, and *Hunter* v. *The People*, 2 Scam. 454.

In view of this contrariety of decision, we do not in this instance feel called upon to determine which rule should obtain with us, but will content ourselves to await a case in which the question is properly submitted for adjudication. As exhibited in this record, the correctness of the action of the court in overruling the plea will not be inquired into, because no objections were urged nor exceptions saved by defendant in the District Court of Montague County to the order of the court changing the venue; and error in chang-

ing the venue cannot be availed of by plea to the jurisdiction in the new tribunal. *Harrison* v. *The State*, 3 Texas Ct. App. 558; *Brown* v. *The State*, 6 Texas Ct. App. 286; *Wheeler* v. *The State*, 42 Ga. 306; *Rothschild* v. *The State* (decided at the present term), 7 Texas Ct. App. 519.

After his plea to the jurisdiction was overruled, defendant Krebs filed his affidavit, under the statute, to the effect that there was no evidence against his co-defendant, Preston, and praying a severance in order that Preston might be first put upon trial, so that on his acquittal his evidence could be used by Krebs on trial of the latter. The severance was granted; Preston was tried, was convicted of murder of the first degree, and appealed from the judgment to this court, where his appeal was still pending when the case against Krebs was again reached and called for trial in the lower court. It was urged that under the circumstances the case could not be proceeded with until Preston's appeal was determined in this court, and that to force him to trial would be a practical abrogation of his rights under the statute (Gen. Laws 14th Leg., 1874, p. 29), and which rights had been expressly recognized in the order granting the severance.

The question is not a new or open one. In the case of *Slawson* v. *The State*, decided at the last Tyler Term (7 Texas Ct. App. 63), and the case of *Myers* v. *The State*, decided at the present term (7 Texas Ct. App. 640), it was. held that where a severance was had to obtain the testimony of a joint co-defendant against whom it was alleged that there was no evidence, and upon the trial of such co-defendant he was convicted, the conviction was a full and complete answer to the affidavit that there was no evidence against him, and the order of severance became *functus officio*. In Myers's case it was said: "The law never contemplated that a defendant who had procured this proceeding could delay the trial until the other party could test the legality of his conviction by an appeal."

No error was committed by the court in overruling defendant's application for a continuance. Being a fourth application, it was a matter entirely within the sound discretion of the court. In addition to this, the record shows that no possible injury could have been done defendant, because one of the witnesses, Knight, subsequently appeared and testified; the testimony of the witnesses Musick and Poland, as taken upon former trials, was offered and read by defendant without objection on the part of the State; and as to the other three witnesses, John Walker, Joseph and Wilborn Cothrum, if they had been present they would not have been permitted to testify to Bill Taylor's statements and declarations, because such testimony would have been hearsay and inadmissible.

With regard to the fourth bill of exceptions, the rule is settled that objections to jurors will not be heard or entertained if the jury has been selected and completed without exhausting the peremptory challenges which the law allows a defendant; for as long as a defendant has a peremptory challenge, it is his business to avail himself of it to get rid of an objectionable juror when the court refuses to stand him aside; and having availed himself of his challenge, and gotten rid of him, it cannot be seen how he can possibly be injured if the panel has been completed without exhausting his remaining challenges, and forcing upon him other jurors to his prejudice.

The fifth and sixth bills of exception were taken to the action of the court in permitting the witnesses to testify to the dying declarations of Mrs. England, the murdered woman. These objections are not sustained by the record. A proper predicate, in every way substantially complying with the statutory requirements, was fully established. Pas. Dig., art. 3125; *Lister* v. *The State*, 1 Texas Ct. App. 739. It was further objected, however, that the dying declarations having been reduced to writing, the written statement was the best and only legitimate testimony. The

record before us does not show affirmatively that the dying declarations were ever reduced to writing, and it does show that Mrs. England made several statements at different times to different parties, all of whom were permitted to testify to the statements made them; and the statements so made all correspond with singular unanimity in all material matters. To have made the objection tenable, the defendant should have established that the declarations had in fact been reduced to writing, and signed by the declarant; in which event the parol evidence would have been inadmissible, unless the prosecution had shown that it was not in the power of the State to produce the writing. Mr. Wharton, in his work on Homicide, declares the rule thus: "If the declaration of the deceased, at the time of his making it, be reduced into writing, the written document must be given in evidence, and no parol testimony respecting its contents can be admitted. And it has been held in England that if a declaration in *articulo mortis* be taken down in writing, and signed by the party making it, the judge will neither receive a copy of the paper in evidence, nor will he receive parol evidence of a declaration which is not itself produced when its production is possible. But where the dying person repeated his declaration three several times in the course of the same day, the fact of its having been committed to writing in the presence of a magistrate on the second occasion will not, it seems, exclude parol evidence of the others, where it is not in the power of the prosecutor at the trial to give that which has been committed to writing in evidence." Whart. on Hom., sect. 766; 1 Greenl. on Ev., sect. 161.

But, as before stated, the fact is not established, so far as this record goes, that the dying declarations had been in fact reduced to writing; and in the absence of such showing we are unable to see that the court committed any error in permitting the introduction of the testimony objected to.

A witness to dying declarations, if he is not able to state

the precise language used by declarant, may state the substance of the declarations. 1 Greenl. on Ev. (12th ed.), sect. 161 *a*. This rule answers one of the objections presented by the seventh bill of exceptions to the evidence of Vanhoozier. The other error complained of in said bill is answered as stated by the judge in his explanation, — that the witness was asked to state his opinion, instead of the facts.

The eighth and last bill of exceptions calls in question the sufficiency and applicability of the charge of the court. No particular error in the charge is pointed out, nor is any shown, or attempted to be shown, in the able brief of counsel for the appellant. We have been unable to discover any error of omission or commission on the part of the learned judge in his submission of the law as applicable to the facts. The charge is full and unobjectionable, and seems to have been satisfactory to defendant at the time, for no additional charges were asked in his behalf.

When we consider the only other remaining question in the case, — the sufficiency of the evidence to support the verdict, — we feel no hesitancy in affirming that in our opinion the jury could not have done otherwise than find this defendant guilty, and finding him guilty, say so by their verdict, that death might be inflicted upon him as an appropriate punishment for his crime. Whatever, if any, doubts might arise as to other parties implicated with him in the murder of the England family, as to the fact of his guilt, judging solely from the evidence presented in this record, we do not see that any dispassionate mind could for a single moment hesitate, much less doubt. As here written, the circumstantial evidence alone and of itself furnishes against him " confirmation strong as proof of holy writ." Over and above that, he is positively identified by those dying exclamations of Susie Taylor, " O mother! old Ben Krebs has come to kill us all," and " O mother! Ben Krebs has killed me ; " and again by Mrs. England, who, conscious

of her approaching death, told him, when brought into her presence for identification, " that she was not mistaken ; that he was the man who did it ; that she knew him by his whiskers, by his Dutch talk and curses, and she said she even knew him by that old white hat he was then holding in his hands." At the time of his trial and conviction, two years and a half had elapsed since that fatal Saturday night when old man England, his aged wife, her manly son, and her youthful daughter were all inhumanly murdered in their home ; and every means which the law afforded and a justly outraged and thoroughly aroused community could devise to ferret out the crime and its perpetrators had been used and exhausted, while able counsel for the accused, with untiring energy, have exerted all their skill and ability to meet the issue and avert its consequences ; and yet, upon a trial had in another county than that where the crime was committed, characterized in every respect by fairness and impartiality, the State has fully made out and established his guilt.

We find in the record of his conviction no error entitling him to another trial, and the judgment against him is therefore in all things affirmed.

*Affirmed.*